198 F.3d 1358 (Fed. Cir. 1999)
 FLORIDA POWER & LIGHT COMPANY, CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., EMPRESA NACIONAL DEL URANIO, S.A., IES UTILITIES, INC., NIAGARA MOHAWK POWER CORPORATION, PENNSYLVANIA POWER AND LIGHT COMPANY and WISCONSIN ELECTRIC
POWER COMPANY, Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Appellee.
 99-5008
 United States Court of Appeals for the Federal Circuit
 Nonprecedential Opinion Issued August 25, 1999
Precedential Opinion Issued November 30, 1999
 
 Appealed from: United States Court of Federal Claims Senior Judge Robert J. YockAlexander D. Tomaszczuk, Shaw, Pittman, Potts & Trowbridge, of McLean, Virginia, argued for plaintiffs-appellants. With him on the brief were John H. O'Neill, Jr. and James B. Hamlin.
 Theodore R. Carter, III, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were David W. Ogden, Acting Assistant Attorney General, J. Christopher Kohn, Director, and Sandra P. Spooner, Deputy Director.
 Before MICHEL, CLEVENGER, and BRYSON, Circuit Judges.
 BRYSON, Circuit Judge.
 
 
 1
 Seven utility companies appeal the dismissal of the action they filed in the Court of Federal Claims. The dismissal order was entered on the government's motion for judgment on the pleadings. Because we conclude that the government is not entitled to judgment at this stage of the case, we reverse and remand.
 
 
 2
 * Nuclear power plants require an enriched form of uranium for fuel. The United States government has long provided uranium enrichment services to both domestic and foreign utility companies. Each of the plaintiff utilities in the instant suit entered into a "Utilities Services Contract" with the United States before September 1, 1992. Under those contracts, the utilities agreed to purchase a fixed percentage of their uranium needs from the United States government. Until July 1, 1993, the contracts were administered and performed through the Department of Energy (DOE).
 
 
 3
 The Energy Policy Act of 1992 amended the Atomic Energy Act of 1954, making significant changes in the government's uranium enrichment services program. The Energy Policy Act established the United States Enrichment Corporation (USEC) to undertake the uranium enrichment services previously performed by DOE. All of the existing uranium enrichment contracts, including those with the plaintiff utilities, were transferred to USEC for administration. See 42 U.S.C. § 2297c(b)(1) (1994). The transfer was effective as of July 1, 1993. See 42 U.S.C. § 2297b-14(e) (1994).
 
 
 4
 The price DOE could charge for enrichment services was constrained by statute. Section 161(v) of the Atomic Energy Act, 42 U.S.C. § 2201(v) (1988), specified that "any prices established under this subsection shall be on a basis of recovery of the Government's costs over a reasonable period of time." USEC's statutory pricing mandate is quite different. USEC is required to "establish prices for its products, materials, and services provided to customers other than [DOE] on a basis that will allow it to attain the normal business objectives of a profitmaking corporation." 42 U.S.C. § 2297c-1(a) (1994).
 
 
 5
 In addition to creating USEC, the Energy Policy Act also created the Uranium Enrichment Decontamination and Decommissioning Fund (the D&D Fund). See 42 U.S.C. § 2297g(a) (1994). That fund was established to pay, among other things, "[t]he costs of all decontamination and decommissioning activities of [DOE] . . . until such time as the Secretary certifies and the Congress concurs, by law, that such activities are complete." 42 U.S.C. § 2297g-2(b) (1994). The D&D Fund is funded in part by a special assessment of up to $150 million collected annually from domestic utilities that purchased enrichment services from DOE between 1945 and October 23, 1992. The first annual assessment, for Fiscal Year 1993, was invoiced in September 1993.
 
 
 6
 The time period at issue in this case is the period between the enactment of the Energy Policy Act on October 24, 1992, and the date on which USEC assumed responsibility for the administration of the enrichment contracts, July 1, 1993. The utilities complain that DOE improperly included decontamination and decommissioning costs in its contract prices during that transition period, because DOE separately recovered those costs through the FY 1993 special assessment. The utilities submitted claims based on that theory to the DOE contracting officer in July 1995. The contracting officer denied the claims as of October 13, 1995, and the utilities thereafter filed suit in the Court of Federal Claims. In the trial court, the government filed a motion for judgment on the pleadings, arguing inter alia that the utilities' action was barred by res judicata and stare decisis. The trial court agreed and dismissed the action.
 
 II
 
 7
 * The trial court held that the doctrine of res judicata bars most of the plaintiff utilities from maintaining this action. According to the court, the claims asserted in this action arose from the same transaction as the claims asserted in the related cases of Barseback Kraft AB v. United States, 121 F.3d 1475 (Fed. Cir. 1997), and Centerior Service Co. v. United States, No. 95-103C (Fed. Cl. Dec. 17, 1997), and should have been asserted in those cases.
 
 
 8
 The utilities argue that this case involves a claim for damages based on conduct by DOE between October 24, 1992, and July 1, 1993, and that the claim for that period could not have been asserted in Barseback or Centerior, because the DOE contracting officer had not issued his final decision at the time those suits were filed. The trial court rejected that argument, concluding that because the utilities received the contracting officer's decision denying their claims before the decisions in those cases were issued, the utilities could have amended their complaints to include the claims asserted in the case at bar.
 
 
 9
 We hold that the utilities' action is not barred by res judicata. The utilities were required to submit their claims to the appropriate contracting officer in order for jurisdiction to vest in the Court of Federal Claims. In Barseback and Centerior, that contracting officer was at USEC, while in this case the contracting officer was at DOE. The Court of Federal Claims could not obtain jurisdiction over the claims presented in this case until the DOE contracting officer issued his final decision, and he did not do so until after the complaints in the Barseback and Centerior cases were filed.
 
 
 10
 The trial court relied upon Electric Boat Co. v. United States, 81 Ct. Cl. 361 (1935), for the proposition that the utilities should have filed a supplemental complaint to include the claim decided by the DOE contracting officer after that contracting officer issued his decision. The Electric Boat case, however, was decided before the adoption of the Federal Rules of Civil Procedure, and the proposition for which it stands is contrary to modern federal practice. For example, in Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1357 (11th Cir. 1998), the Eleventh Circuit held that in light of Federal Rule of Civil Procedure 15(d), which makes supplemental pleadings optional, "the doctrine of res judicata does not punish a plaintiff for exercising the option not to supplement the pleadings with an after-acquired claim." See also Maharaj v. Bankamerica Corp., 128 F.3d 94, 97 (2d Cir. 1997) ("Plaintiff's failure to supplement the pleadings of his already commenced lawsuit will not result in a res judicata bar."); Computer Assocs. Int'l, Inc. v. Altai, Inc., 126 F.3d 365, 369-70 (2d Cir. 1997) (Plaintiff "was under no obligation to amend its complaint" and "res judicata does not bar litigation of claims arising from transactions which occurred after the [original] action was brought."); Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist., 750 F.2d 731, 739-40 (9th Cir. 1984) (same).
 
 
 11
 In support of the trial court's application of res judicata, the government contends that the timing of the final decisions issued by the DOE and USEC contracting officers was within the control of the utilities. To allow the utilities to avoid a res judicata bar through "artful manipulation of the CDA dispute process," the government argues, would "essentially repeal the rules of preclusion." We reject that argument. Res judicata is inapplicable here not simply because of the timing of the two contracting officers' decisions, but because the plaintiffs' claims relating to the period before the transfer of their contracts to USEC differ significantly from their claims relating to the period after the transfer. The two sets of claims involve not only different time periods, but also different agencies with different contracting officers and different statutory mandates regarding pricing policy. Those differences may or may not result in a different disposition of the utilities' claims, but they at least call for a different legal analysis. We therefore conclude that the two sets of claims are sufficiently discrete that the pre-transfer claims are not barred by res judicata on the ground that the plaintiffs should have arranged to have them joined in the same action with their post-transfer claims.
 
 B
 
 12
 The government next argues that collateral estoppel bars several of the plaintiff utilities from making any of the arguments they have raised on appeal. We disagree. The argument that the utilities are pressing upon us in this appeal is that the enrichment price charged by DOE during the transition period before the contracts were transferred to USEC violated established DOE pricing policy because the price was not cost-based. Contrary to the government's contention, that issue was not decided in either the Barseback or the Centerior cases. The issue decided in those cases was whether the enrichment price charged by USEC after the transition period violated established DOE pricing policy, a different question as to which the judgment in those cases has no collateral estoppel effect in the present case.
 
 III
 
 13
 Because plaintiff Niagara Mohawk Power Corporation was not a party to either Barseback or Centerior, the trial court concluded that the action could not be dismissed as to Niagara on res judicata grounds. Instead, the court dismissed Niagara's action on the ground that Niagara's theory of recovery was foreclosed by this court's decisions in Barseback and Yankee Atomic Electric Co. v. United States, 112 F.3d 1569 (Fed. Cir. 1997). The court added that those decisions would also have required dismissal of the other plaintiffs if their claims had not already been dismissed on res judicata grounds. Because Niagara's action was not dismissed on the basis of res judicata, we must address the court's dismissal of Niagara for failure to state a claim on which relief can be granted. And because we reverse the res judicata dismissal of the other plaintiffs, we must address the court's alternative ruling that the remaining plaintiffs' claims were subject to dismissal on the same ground.
 
 
 14
 The utilities argue that DOE should have reduced its contract prices for enriched uranium between October 24, 1992, and July 1, 1993. The established DOE policy during that period, the utilities contend, was to base the price of enrichment services on their cost. The plaintiffs urge that because the domestic utilities were required to contribute to the D&D Fund during that period, and because the D&D Fund defrayed some of the costs previously incorporated into the contract price, the contract price should have been reduced as soon as the D&D Fund came into existence.
 
 
 15
 The utilities concede that the requirement in section 161(v) of the Atomic Energy Act that DOE price its enrichment services based on cost was repealed as of October 24, 1992, and that their argument therefore does not rest in any measure on the statute. Instead, they claim that the DOE policy of cost-based pricing did not change at any time during the transition period, and that when the D&D Fund began absorbing some of the costs previously borne by DOE out of the receipts from the uranium enrichment services, DOE's policy required it to make an equivalent reduction in the enrichment services price.
 
 
 16
 Article IV of the standard enrichment services contract provides that "[t]he charges to be paid to DOE for enrichment services provided to the Customer hereunder will be determined in accordance with the established DOE pricing policy for such services." Article I(8) of the contract then defines "established DOE pricing policy" as "any policy established by DOE that is applicable to prices or charges in effect at the time of any services under the contract." The utilities argue that it is a material question of fact whether, during the period between October 24, 1992, and July 1, 1993, a portion of DOE's enrichment price was attributable to decontamination and decommissioning costs that DOE will never incur (because those costs are being defrayed by monies contributed to the D&D Fund). The trial court held that the utilities' contract-based theory of recovery could not succeed in light of this court's interpretation of the pertinent contract language in Yankee Atomic.
 
 
 17
 This court in Yankee Atomic interpreted the same contractual provision that the utilities are relying on in this case, finding that "[t]he language of the contract is directed at the prices charged for providing enriched uranium to Yankee Atomic, and not to any decontamination or decommissioning costs which may subsequently arise." Yankee Atomic, 112 F.3d at 1580. The court made that statement by way of explaining that later-arising decontamination and decommissioning costs were not built into the contract price (and thus there was no unmistakable promise by the government not to impose a general assessment on utilities that had benefited from DOE's uranium enrichment services). The court did not suggest, however, that the enrichment services contract price set by DOE contained no decontamination and decommissioning component of any kind. Indeed, the court in Barseback made clear that "DOE's cost-recovery based pricing policy included a D&D component." Barseback, 121 F.3d at 1483.
 
 
 18
 While both Yankee Atomic and Barseback involved questions closely related to the issue presented here, neither provides a conclusive answer to the utilities' contractual claim in this case. Yankee Atomic did not address the question whether DOE's prices during the transition period recovered more than its established pricing policy allowed; Barseback focused on the pricing policy of USEC, not that of DOE, and the court therefore was not required to decide whether the prices DOE charged during the transition period were unlawful.
 
 
 19
 Although the utilities pleaded this case broadly, the only remaining legal issue in the case is whether DOE breached the pricing provision of the enrichment services contracts by charging for decontamination and decommissioning costs that were defrayed out of the D&D Fund in violation of DOE's established pricing policy. To determine whether that theory is viable will require resolution of several legal and factual questions: (1) whether DOE had a cost-based pricing policy during the transition period between September 1, 1992, and June 30, 1993; (2) whether any purported costs that were included in DOE's contract price during that period were actually being defrayed from the D&D Fund; and (3) whether the inclusion of any purported costs that were being defrayed from the D&D Fund violated the utilities' contracts by violating the "established DOE pricing policy" for enrichment services applicable under Article IV of the contracts. Those questions are not amenable to resolution on the pleadings. We therefore remand to the trial court to resolve those questions and any others that the court may determine are pertinent to the utilities' contract-based claim.
 
 
 20
 Each party shall bear its own costs for this appeal.
 
 
 21
 REVERSED and REMANDED.